PETER WELLER and Arthur Jalbert, Respondents, v. MULGREW & SONS COMPANY, Appellant.

(192 N. W. 969.)

**Drains — contractor excavating public drainage ditch held to reasonable care, to avoid overflowing adjacent lands.**

1. A contractor, who is engaged in excavating a public drainage ditch, must use, in the performance of his contract, reasonable care so as to avoid injury to adjacent lands and to him the familiar maxim "sic utere tuo ut non alienum lædas" is applicable.

**Drains — ditch contractor held liable for damages for overflowing adjacent fields.**

2. Where a contractor engaged in excavating a drainage ditch has obstructed and filled up an old road ditch that served to drain flood waters in the territory tributary and, where, after a heavy rain, flood waters in such road ditch, through the obstruction, were cast upon plaintiff's field and, thereupon, the contractor, becoming cognizant of the conditions, removed the obstruction by a communicating ditch where by such ditch properly functioned to drain off

Note.—On application of common law maxim "sic utere tuo ut non alienum lædas" to corporations as well as individuals, see 20 R. C. L. 7; 5 R. C. L. Supp. 1073.

flood waters, and where, thereafter, after receiving advice from the chairman of the drainage commission to use his own judgment, the contractor renewed the prosecution of the work and again maintained the obstruction so as to cast flood waters upon plaintiffs' field and to destroy his crops there growing, it is *held*, for reasons stated in the opinion, that, under the circumstances, the duty was imposed upon the defendant to exercise reasonable care in the continuation or renewal of the work, for the failure of which plaintiffs may recover damages suffered thereby.

**Drains — right of way release granted county for ditch held not to release damages caused by contractor's negligence.**

3. A right of way release, granted by plaintiffs to the county for the construction of such drainage ditch, did not release damages occasioned by the contractor's negligence.

**Drains — extraordinary character of storms and the sole contributing and proximate cause of damages to crops by flood claimed to be due to contractor's negligence held for the jury.**

4. Questions concerning the extraordinary character of the storm and concerning the sole contributing and proximate cause of the damages awarded, were for the jury.

Opinion filed February 27, 1923. Rehearing denied April 3, 1923.

Drains, 19 C. J. § 204 p. 711 n. 86.

In District Court, Cass County, *Englert, J.*

Action to recover damages for water flooding.

Defendant has appealed from an order denying a motion to enter judgment notwithstanding the verdict.

Affirmed.

*Young, Conmy & Young,* for appellant.

"A contractor to excavate a ditch for a drainage district established by public authority is not liable for damages naturally resulting to adjacent lands from carrying the plan of drainage into execution." Fitzgibbon v. Western Dredging Co. 117 N. W. 878; Hipwell v. Surety Co. 130 Iowa, 656, 105 N. W. 318; Pearson v. Zable, 78 Ky. 170; Shaw v. Crocker, 42 Cal. 435; Chapel v. Smith, 80 Mich. 100, 45 N. W. 69.

"In the exercise of its privileges and powers, a drainage district must exercise reasonable care and skill, and, if it be necessary to do a particular act in a particular manner, it may do so, though evil may result to others; but if the same act may as easily be done in another way, without hurt to others, it is the duty of the drainage district to adopt the nonhurtful method of exercising its powers." Moore v. Swamp

Dredging Co. 88 So. 52; Nicholson v. Inlet Swamp Drainage Dist. 117 N. E. 445; Olson v. Ry. Co. (Minn.) 38 N. W. 490; Railway Co. v. Huddelston, 52 N. E. 1008; Henderson v. Hines (N. D.) 183 N. W. 531; Karo v. Rye Twp. 13 N. D. 458, 101 N. W. 894; Froemke v. Parker, 41 N. D. 417; Davenport Twp. v. Leonard Twp. 22 N. D. 151; Gulf C. & S. F. R. Co. v. Huffman, 81 S. W. 537; Berninger v. Sunbury, H. & R. Co. 53 Atl. 361; Cleveland, C. C. & St. L. R. Co. v. Wisehart, 67 N. E. 993; Bellinger v. N. Y. C. R. Co. 23 N. Y. 49; Harris v. Lincoln & N. W. R. Co. 137 N. W. 865; Newby & White v. Board of Drainage Commrs. (N. C.) 79 S. E. 266; Van Sickle v. Drainage Dist. 172 S. W. 405; Soules v. N. P. R. Co. 34 N. D. 7; Reichert v. N. P. R. Co. 39 N. D. 114.

"Where the evidence as to the unprecedented character of a flood was such that reasonable men could not differ, the question whether the negligent construction of a bridge caused an overflow should not be submitted to the jury." Wm. Tackaberry Co. v. Simmons Warehouse Co. 152 N. W. 779.

*Fowler, Green & Wattam,* for respondents.

A contractor constructing a drain, if by his negligence he obstructs an existing ditch so as to overflow another's land, may not escape liability on the grounds that the method of digging the drain was necessary for his own convenience in performing the contract, or was done under the direction of the drainage board's engineer, and the board itself. Dredging Company v. Madin (Ark.) 175 S. W. 400; City of Tucson v. Dunseith (Ariz.) 139 Pac. 177; Boschulte v. Elkhorn R. Drainage Dist. (Neb.) 167 N. W. 730; Jungblum v. R. Co. (Minn.) 72 N. W. 972.

An act of God signifies, in legal phraseology, "any inevitable accident occurring without the intervention of man. The expression 'act of God' excludes the idea of human agency, and if it appears that a given loss has happened in any way through the intervention of man, it cannot be held to have been the act of God, but must be regarded as the act of man." Black v. Pioche, 35 Cal. 423.

"It is also agreed that if the negligence of the defendant concurs with the other cause of the injury in point of time or place, or otherwise so directly contributes to the plaintiff's damage and that it is reasonably certain that the other cause alone would not have sufficed to pro-

duce it, the defendant is liable notwithstanding he may not have anticipated, or been bound to anticipate the interference of the supreme force which, concurring with his own negligence, produced the damage." 1 Shearm. & Redf. Neg. 6th ed. § 39; cited in Piqua v. Morris, 98 Ohio St. 42, 120 N. E. 300. See also Brown v. Coal Co. (Iowa) 120 N. W. 732 and cases cited. Gould v. Schermer, 101 Iowa, 582, 70 N. W. 697; Burke v. Creamery Pkg. Co. 102 N. W. 793, 126 Iowa, 730; Hasse v. Morton, 115 N. W. 921; Grimes v. Bowerman, 92 Mich. 258, 52 N. W. 751; McMahon v. Davidson, 12 Minn. 357; Campbell v. City of Stillwater, 32 Minn. 308, 20 N. W. 320; King v. C. M. & St. P. R. Co. 77 Minn. 104, 79 N. W. 611.

## Statement.

BRONSON, Ch. J. Plaintiffs sue to recover for damages to crops through water flooding. A verdict for $600 in plaintiffs' favor was returned. Defendant has appealed from an order refusing to enter judgment in its favor notwithstanding such verdict.

The facts are: Plaintiffs own a half section of farm lands abutting upon the county line between Cass and Trail counties, North Dakota, and distant west from the Red river, about 2 miles. Defendant is a drainage ditch contractor. Along this county line, running east and west past these farm lands, there was a graded road with road ditches on each side that had existed for some twenty years. The flow of water in these ditches was eastward. Pursuant to some testimony in the record the drainage from these farm lands was northward into the south ditch along this graded road. The land in the vicinity was level, flat land. From plaintiffs' farm lands there were runways and furrows for purposes of drainage into this south road ditch. In 1920 there was a good grade on the road and a good ditch along these lands upon the north. During times of heavy rains, this ditch would handle the surface waters in fairly good shape without causing the same to back up or spread over these farm lands. Flood waters would drain off these lands as well as off other farm lands in the vicinity; if trouble was experienced with flood waters upon the fields, neighboring lands were likewise affected.

In 1920 defendant made a contract with the commissioners of Cass

county and Trail county, composing a bicounty drainage board, for the construction of a drainage ditch, to be known as drain No. 42, along this county line from Red river westward about 6 miles. The specifications provided that all material taken from the excavation of the ditch should be deposited upon one or both sides of the ditch as directed by the engineer; that, where deposited as a spoil bank or on the highway and leveled into a road, a berm of 8 feet at least should be left; that a road should be built along that part of the ditch where the road now exists, such road to be 26 feet wide on the top, crowned one foot in the center. That the contractor should have charge and be responsible for the entire line of work until its completion and final acceptance. That he "shall carry on the work as expeditiously as possible, with due regard to the safety and convenience of public travel and he shall be responsible for any damage to property or individuals due to the negligence on his part or on the part of his employees." The contract required the ditch to be completed and ready for acceptance on or before August 1st, 1921.

For purposes of this ditch construction, plaintiffs granted, by deed dated March 31st, 1921, to Cass county, a right of way 75 feet wide along the north side of their lands. In this deed they released all claims to damages by reason of the laying out, construction, and maintenance of such ditch through their lands. This ditch was constructed along the north line of their lands about 10 feet south of the south road ditch. This ditch varied in depth from 4 to 9 feet. The road ditch was about 3 feet deep.

In October, 1920, defendant initiated this construction and worked about three weeks. In April, 1921, the work was renewed. On June 14th, 1921, defendant had progressed with the work to plaintiffs' farm and a distance of about 150 feet along the north line thereof. In this construction a crew of seven men were employed upon a night and day shift. A steam shovel, or digging machine was used. In excavating the dirt it could deposit the same on either side of the ditch, through a crane, as might be directed. As the ditch was being constructed the excavated dirt was deposited on the graded road and in the south road ditch. This created a road some 23 to 24 feet wide with an average depth of dirt some 3 to 5 feet deep on top of the road and that much higher than the surrounding land; it filled up the south road ditch;

some dirt was also deposited on the south side of this drainage ditch so as to leave a berm. .

Upon these farm lands plaintiffs had sown, in the fall of 1920, about 120 acres of rye and, in April, 1921, about 140 acres of wheat and 22 acres of flax. These crops were upon summer fallowed land. On June 14th, 1921, these crops were in fine condition. There had been little moisture during the spring. The rye was just starting to fill. No water had occasioned any trouble until the rain storm about to be mentioned.

On Tuesday, June 14th, 1921, about 4 or 5 A. M. a heavy rain occurred, lasting several hours. Then, the south road ditch was closed where dirt had been placed. Then, there was no opening into the drainage ditch. Pursuant to the testimony of defendant's day engineer, who operated the engine and shovel, about 8 A. M. or later, they cut a ditch from the old road ditch into the new ditch; a ditch as large as the old ditch. They did not operate that day. The next day they operated about two hours. Their operations filled the ditch up, backed up the water, and they had to stop. Then they opened the ditch up again. On June 16th, the third day, they started about noon. They ran until 6 P. M. There was water standing around in .the fields on both sides. When they were not running and there was an opening from the road ditch into the drainage ditch, the water ran off all right. There was no chance for it to run off when they were operating.

Pursuant to the testimony of defendant's night engineer, the rain started about 4:30 A. M. It was a very heavy rain, like a cloudburst. It rained so hard that the belts got wet and they could not operate the machine any longer. It rained about two or two and a half hours. He went to breakfast about 6 A. M. The next night they started up but the water backed up and they had to shut down. On the night of the 15th they did not work at all nor on the night of the 16th. He saw plaintiff Jalbert in the field on this day after the rain, digging ditches in the field. There was a culvert to the east of the machine on the section line; it was running full of water. This was the second day after the rain. Water was running down the north ditch. At the northwest corner of the quarter he noticed the culvert to be blocked and filled. There was water standing in the fields all around. When they were

49 N. D.—41.

operating the machine, the water could not flow out of the south road ditch. It had to stay there until it dried up.

Pursuant to testimony of defendant's foreman, he had general charge of the whole construction. For some four or five years he has been working for defendant in charge of this ditching machine. When he got up about 5:30 A. M. it was raining and this rain continued for an hour and a half. After the rain stopped there was considerable water in the road ditch and on the land to the south. They did not work that day only they opened up a ditch from the road ditch to the drainage ditch to let the water out. They did not run that night. On the night of the next day they started up and worked for half an hour or something like that; the water commenced to fill up again and they had to shut down; they did not run any more that day nor that night. On the next day they started in the afternoon and kept on working after that. When they started this next day there was some water coming down the ditch. There was water then in the fields; in all the fields around there. The north ditch took care of the water all right. After this rain all the ditches were full. Plaintiff Jalbert was there a few times to see him about stopping the machine. Larson, chairman of the Drainage board, came about noon to see him. Larson told him "I would not start up now. Use your own judgment when you think you can go to work. Whenever you think the water is down enough to start up, use your own judgment." When the machine was stopped and this opening was in the drain it took care of the water in good shape and drained it in good shape. Of course, when they started to work there was no place for the water to go. It had to back up and would have to go right over the banks. He shut down every time he noticed it going over the banks and he told his men and gave them orders to shut down.

Pursuant to the testimony of the plaintiff Jalbert, on the day after the rain he went down to the ditching machine. A ditch had just been opened from the road ditch. On the road home he saw the foreman and told him the water was coming down for some 6 miles back and that he would like to have him stop as he thought the water would not get through the ditch for three or four days. He shut down until that night but the machine was operated all that night and until the next morning about half past ten. Again he saw the foreman. The dirt was being put into the ditch as the machine was operating. The road

ditch was full and the water was running off into the field. After a talk with the foreman he stopped the machine, made an opening and the water started to run off. The foreman advised him that he could not stop any more for the farmers; that plaintiff had to get orders from the highway authority. Plaintiff then saw Larson. He procured from him an order to have the foreman stop. When plaintiff got back to the ditching machine it was running right along. The road ditch was full and the water was going upon his fields. He gave the foreman this order and he stopped again that morning about 9 A. M. and until next morning at 6 A. M. The road ditch was then not quite so full, but it was not down enough so he could get the water off his field. Then he again talked with the foreman about stopping. The foreman advised him that he should go and see the chairman of the drainage board. Plaintiff could not locate over the telephone, the chairman. He came back again and the foreman said he would shut down. He did shut down from 9 A. M. until noon; then he started up and continued operations. Otherwise he testified that he dug a ditch west of the machine across the road. He tried to protect himself because the machine was going to start, but his brother, who had land on the north side came that night and filled it up. This was the first day after the rain. Also he dug ditches in his field the second day after the rain to make clean runways so the water would run off.

Another farmer testified he owned land a mile west from plaintiff's on the north and south sides of the road. After the rain the ditches were full of water. Land on the north side was pretty well covered with water. On the south side water was backing up into plaintiffs' field. The ditching machine was then working on the 14th. At his corner, water was actually running over the grade to the north from the south and from the west towards the east. The water remained on the land for about a week. Ordinarily this road ditch would carry the water off. This was a heavy rain but he did not think it was as much as there had been at times before.

Pursuant to the testimony of plaintiff Jalbert's brother he farmed the lands on the north side of plaintiffs' land. He thinks the south ditch was a little larger than the north road ditch. There was water on his land. This water flowed away through the north road ditch and his crops were not drowned out. After the rain he went down to the

ditching machine. It stopped that morning but started again at 6 P. M. It ran all that night. When this ditch was open the water ran out pretty good. He shut off the ditch that his brother had dug across the road from 30 to 40 rods in front of the machine. The water was running across and drowning him out and he shut it off to protect himself. He went over to the machine that morning about 9 or 9:30 A. M. They opened a ditch into the road ditch then while he was there. They operated the machine the morning of June 15th, but not in the afternoon. They stopped in the forenoon of June 16th and started up again.

Pursuant to the testimony of Larson, chairman of the drainage commission, he went to the machine on the day after the rain. In the section where the machine was, there was water in all the fields. On the north side the water was running pretty strong in the road ditch. On the south side the water was running slowly out of the field. It was flowing into the ditch at the east end and was going right out because they had cut an opening between the old road ditch and the new ditch they were digging. He arrived about noon and stayed a couple of hours. He saw the foreman and told him he had better wait until the water got down and the foreman agreed to do that. When he asked how long he should wait Larson advised him that he could not set any time, but he must use his own judgment; that as long as the water ran as strong as it did he did not think it advisable to start because it would only fill up in a little while and run upon the fields. Larson was a witness for the defendant.

Pursuant to the testimony of the engineer of the drainage commission, called as a witness for defendant, he instructed the defendant to deposit the dirt as indicated on the plans and profile. They required the earth to be placed on the highway and leveled and graded to form a perfect and good road after construction; the balance placed on the land side, which dirt was to be graded and leveled down after construction. It was impossible to pile this dirt in the highway and avoid putting the dirt in one or the other ditch. The work was done in accordance with the plans and specifications and entirely to his satisfaction. He gave no orders to the defendant to cease work. He did have some talk with the chairman of the drainage commission about the time of the storm. The water remained on plaintiffs' field some ten days and destroyed crops.

## Contentions.

The defendant maintains that the evidence is insufficient to show any negligence on defendant's part proximately causing the loss; that, upon the record, the work was properly done in accordance with the plans and specifications; that the contractor, accordingly, was not liable for damages resulting therefrom; that there is no liability; furthermore, because plaintiffs gave a right of way deed for this construction and released all claims to damages thereby; that upon the evidence it appears, as a matter of law, that the damages were occasioned through an unusual and extraordinary storm for which defendant was not responsible; that, in any event, there were causes other than defendant's negligence which occasioned the loss; so that it was impossible for the jury to determine the proportion, if any, of defendant's contribution to such loss.

## Decision.

Upon the record and the contentions made by defendant, the following principles of law are invoked by the parties:

(1) That a contractor who has constructed a public drainage ditch properly, pursuant to contract, is not liable for damages occasioned thereby to adjacent lands.

(2) That a contractor who is engaged in excavating a public drainage ditch must use, in the performance of his contract, reasonable care so as to avoid injury to adjacent lands and that to him the familiar maxim "sic utere tuo" is applicable.

If the first stated principle of law be conceded, the question is presented whether the record discloses evidence to support the jury's finding that defendant failed to use reasonable care as required under the second principle of law.

It may be conceded without deciding, as defendant contends, that the contractor properly excavated this ditch pursuant to the plans and specifications and properly deposited the excavated dirt in the road ditch and upon the graded road; that all of this work was performed to the entire satisfaction of the drainage commission or its engineer; and, consequently, neither the drainage commission, as a public body, nor the

defendant, as a contractor, are liable for any resulting damages occasioned thereby.

However, from the evidence the finding is warranted that in the prosecution of this work the old road ditch was obstructed as the new drainage ditch was constructed. This process occasioned neither harm nor damage excepting when rains came and the functions of the old road ditch were required for drainage purposes. Of course, in such event, the obstruction, created in the prosecution of the work, served to dam water which necessarily had to escape over plaintiffs' adjoining fields. When the rains came, defendant, through its foreman and employees, became cognizant of the effect of so damming the water through this obstruction. Upon request made defendant removed this obstruction by a communicating ditch between the old road ditch and the new drainage ditch and adjourned the prosecution of the work. This served to permit the drainage system, theretofore existing, to function and the flood waters to run off and not occasion damage. Defendant renewed its work and discovered that the renewal of such work served to renew or maintain the flood and to give the occasion for floods upon, and damage to, plaintiffs' lands. Again it ceased work and removed the obstruction. It started again. Then defendant was requested by the drainage commission, through its chairman, to halt the prosecution of this work and to use its judgment so that damages might not be occasioned. Defendant assumed to act upon these orders and suggestions. It gave orders through its foreman, in that regard to its employees. Thus, with knowledge of the situation, defendant presumed to act and to prosecute the work and, through the floods existing, perhaps resulting, plaintiffs' crops were in part destroyed.

Do these facts form a basis for a finding of negligence or the failure to exercise reasonable care? Were the damages sustained directly attributable to defendant's negligent acts through the avoidance of which, if defendant had so chosen, injury might have been obviated? If it be conceded that defendant had the right, under his contract, pursuant to the plans, specifications, and orders of the drainage engineer, to deposit the dirt in the ditch and upon the road, and that its acts in so doing did not constitute negligence, yet, was it a failure to exercise reasonable care, the degree of care demanded by the circumstances, hence, negligence, to continue or renew the prosecution of this work

when, within defendant's knowledge, damage would thereby be occasioned to the property of others?

These questions involve fundamental considerations and the application of the familiar maxim "sic utere tuo ut non alienum lædas." Upon the record, the facts warranted the finding that defendant possessed a knowledge of conditions and possible or probable consequences that gave occasion for the exercise of foresight and care; a knowledge that might lead an ordinarily prudent man to apprehend danger and damage to the property of others, unless in the conduct of his own affairs, even his own rights, he acted with prudence and care.

Thus, it may be said that the facts warrant a finding that, under the circumstances, a duty was imposed upon the defendant for the violation of which plaintiffs might hold such defendant accountable; that the performance of this duty did not prevent, under the circumstances, the proper performance and fulfilment of the terms of defendant's contract. Therefore, we are of the opinion that the question of the performance or violation of this duty, in continuing or renewing the prosecution of this work under the circumstances, and, whether the violation of such duty was the proximate cause of the damages suffered, was properly a question of fact for the jury and that its finding should not be disturbed. See 29 Cyc. 420; 20 R. C. L. 7, 9, 12; 1 Thomp. Neg. § 685; Hope v. Fall Brook Coal Co. 3 App. Div. 70, 38 N. Y. Supp. 1040, 1042; 19 C. J. 711; Solberg v. Schlosser, 20 N. D. 307, 310, 312, 30 L.R.A. (N.S.) 1111, 127 N. W. 91; Fitzgibbon v. Western Dredging Co. 141 Iowa, 328, 117 N. W. 878; Mitchell v. Hahn, 131 Ark. 286, 198 S. W. 528; Greenwell v. Wills & Sons, 20 Mo. App. 651, 239 S. W. 578; Tant v. Little River Drainage Dist. 210 Mo. App. 420, 238 S. W. 848; Kochtitzky v. Bond, 128 Ark. 255, 194 S. W. 8; Moore v. Swamp Dredging Co. 125 Miss. 842, 88 So. 522; Timothy J. Foohey Dredging Co. v. Mabin, 118 Ark. 1, 175 S. W. 400.

The right of way granted by plaintiffs to the drainage commission for the construction of this drainage ditch and the release therein of all claims to damages by reason of the laying out, construction, and maintenance thereof through plaintiffs' land did not, by its terms, or otherwise, release or purport to release damages that might be occasioned through the contractor's own negligence. See Hopper v. Elkhorn Drainage Dist. 108 Neb. 550, 188 N. W. 239.

No complaint has been made concerning the instructions. We are not prepared to hold, as a matter of law, that the rains were of such an extraordinary and unprecedented character so as to absolve the defendant from liability, or that defendant's acts were not the sole contributing and proximate cause of the damages awarded. See Soules v. Northern P. R. Co. 34 N. D. 33, L.R.A.1917A, 501, 157 N. W. 823; Henderson v. Hines, 48 N. D. 152, 183 N. W. 531, 535; Meehan v. Great Northern R. Co. 13 N. D. 432, 443, 101 N. W. 183.

The order is affirmed with costs.

CHRISTIANSON, JOHNSON, NUESSLE, and BIRDZELL, JJ., concur.